UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Michael S. Eisenga, | ) | CASE NO. 20-10423-cjf |
| | ) | |
| DEBTOR. | ) | |

**UNITED STATES TRUSTEE'S MOTION
TO DISMISS CASE OR APPOINT A TRUSTEE**

Patrick S. Layng, the United States Trustee for the Western District of Wisconsin (the "U.S. Trustee"), by and through his attorney, Jennifer K. Niemeier, moves pursuant to 11 U.S.C. § 1112(b), for an order dismissing the captioned Chapter 11 case for cause. In support of the Motion, the U.S. Trustee states as follows:

**JURISDICTION**

1. This is a core proceeding concerning the administration of the estate pursuant to 28 U.S.C. § 157(b)(2)(A) which this Court may hear and determine.

2. Venue of this case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The U.S. Trustee has standing to file the Motion under 11 U.S.C. § 307 and 28 U.S.C. § 586(a)(3).

**FACTUAL SUMMARY**

4. Michael S. Eisenga ("Debtor") commenced this case on February 11, 2020, by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Eastern District of Wisconsin.

5. On February 13, 2020, the case was transferred to the Western District of Wisconsin because the Debtor's home address is located in the Western District.

2

6.       The Debtor filed schedules and statements on March 11, 2020, and he filed amended schedules and Statement of Financial Affairs (SOFA) on March 26, 2020, and again on April 16, 2020.

7.       On Schedule A/B, question 44, the Debtor lists an interest in First American Properties, LLC ("First American"), to which he assigns a value of $0.

8.       The Debtor is the sole member of First American, an operating company that operates assisted living complexes and owns real estate ventures. First American is the sole member of CCC Lot 2, LLC ("CCC").

9.       CCC also commenced a Chapter 11 bankruptcy case on February 11, 2020, in the Eastern District of Wisconsin and was assigned case number 20-10422. CCC's case was transferred to the Western District of Wisconsin on February 13, 2020.

10.       CCC's petition designates CCC as a single asset real estate case as defined in 11 U.S.C. § 101(51B).

11.       On February 13, 2020, the Debtor filed a motion for joint administration with the CCC case, stating that CCC is an affiliate that ties back to Mr. Eisenga. *Motion for Joint Administration,* Dkt. No. 10, ¶ 12. The motion further states that the activities of the Debtor and CCC are intertwined; the success of both chapter 11 cases depends on each other; and the debts are related to the intertwined business entities. *Id.* at ¶ 15.

**CCC and Alliant Debt**

12.       CCC lists one asset on its Schedule A/B: a parcel of commercial real estate valued at $4 million that holds a vacant grocery store (the "CCC Property").

13.       CCC lists only two debts on its schedules: a secured debt to Alliant Credit Union ("Alliant") for $6,892,093; and an unsecured debt of $161,264 to Supervalu Holdings, Inc.

3

14. In CCC's case, Alliant filed a motion to dismiss and attached numerous exhibits to which this motion refers.[1]

15. Alliant loaned CCC nearly $7 million after CCC and the Debtor produced documentation that the CCC Property was subject to a twenty year lease agreement with Festival Foods, Inc. ("Festival Lease") and further secured by a guaranty from Festival's parent company, SUPERVALU Holdings, Inc. ("SUPERVALU Guaranty").[2]

16. The Debtor also lists a $6,975,000 debt to Alliant on his amended Schedule E/F for a "personal guarantee."

17. After CCC was unable to secure a stable tenant for the CCC Property, CCC and the Debtor defaulted on the Alliant loan. Alliant initiated foreclosure proceedings and a receiver took control of the CCC Property.[3] The CCC Property was eventually sold at a sheriff's sale, but both CCC and the Debtor filed for bankruptcy relief just hours before confirmation of the sheriff's sale.

18. In July 2019 a receiver was appointed to manage the CCC Property and pay all of its expenses. To date, all expenses paid by the receiver have been funded solely by protective advances made by Alliant.

19. The Debtor provided the United States Trustee with a November 2019 appraisal of the CCC Property indicating its value is $4.1 million while vacant, or $6.33 million if occupied by a tenant. A true and correct copy of the appraisal is attached as Exhibit 1. Based on

---

[1] Alliant's motion to dismiss was filed in Western District of Wisconsin Bankruptcy Court case number 20-10422, docket number 27.
[2] *See Alliant's Motion to Dismiss*, ¶¶ 7, 9 (Dkt. No. 27, Case No. 20-10422).
[3] The foreclosure action was filed in Columbia County, Wisconsin, case number 19-CV-148, on May 30, 2019.

Document     Page 4 of 14

this appraisal, the CCC Property would still be under secured by $645,000 even if a tenant is secured, and the Debtor would bear responsibility for a deficiency due to his personal guaranty.

20. On April 17, 2020, the Debtor filed a response to Alliant's Motion to Dismiss and included a draft of a recent appraisal, dated March 20, 2020, that values the CCC Property at $4.7 million while vacant, or $6.9 million while occupied by a tenant.[4]

21. On March 12, 2020, the Debtor appeared with counsel at the first § 341 meetings in both this case and the CCC case. In the CCC case, the Debtor indicated that his reorganization plan is to secure a tenant for the CCC Property to realize its full value.

22. Alliant's counsel attended the § 341 meeting and questioned the Debtor regarding the Alliant loan. Alliant alleged that the Debtor forged both the Festival Lease and SUPERVALU Guaranty. Alliant also produced an Affidavit of Forgery, signed by a SUPERVALU employee, Barbara Hanson Parks, stating that Ms. Parks' signature was forged on the SUPERVALU lease.[5]

23. When confronted with the Festival Lease and SUPERVALU Guaranty, the Debtor invoked his Fifth Amendment rights under the United States Constitution and refused to answer all subsequent related questions.[6]

24. On March 19, 2020, Alliant filed a motion to dismiss the CCC bankruptcy case, alleging bad faith and a substantial and continuing loss to the bankruptcy estate and no reasonable likelihood of rehabilitation. Alliant alleged that the value of the CCC Property is $2.2 million on an "as is" basis. Further, the CCC Property has been vacant since at least May 2019 with all of its expenses paid by Alliant. *Id.* at ¶¶ 23-25.

---

[4] *See CCC's Response to Alliant's Motion to Dismiss* (Dkt. No. 43, Case No. 20-10422), Exhibit A.
[5] *See Alliant's Motion to Dismiss,* Exhibit O (Affidavit of Barbara Hanson Parks).
[6] *See Alliant's Motion to Dismiss,* Exhibit P (transcript of the § 341 meeting).

25. To date, the receiver still holds control of the CCC Property and the Debtor/CCC have made no attempts to regain control of it.

**Domestic Support Obligation**

26. The Debtor lists a domestic support obligation for child support arrears on Schedule E/F in the amount of $200,000 owed to Claire Hawthorne.[7]

27. Schedule I lists the Debtor's monthly income as $7,255, all of which is generated from his various business interests.

28. Schedule J lists the Debtor's monthly child support obligation as $15,000 and his monthly disposable income as negative <$13,485>.

29. Neither the original nor the amended SOFA question 6 list any payments to any one creditor exceeding $6,825 in the ninety days before the case was filed.

30. The Debtor and his counsel attended a continued § 341 meeting on March 27, 2020. When asked how he intended to reorganize given his monthly deficit of -$13,485, the Debtor did not have an answer. Debtor's counsel stated they "were working it."

31. The motion for joint administration indicates that the Debtor's plan is to lease the CCC Property and "if given a reasonable period of time" the CCC Property will increase to "the stabilized value of $6.3 million." *Motion for Joint Administration*, Dkt. No. 11, ¶ 8. The Debtor further states that "the cash flow from his other businesses would then be sufficient to pay all creditors in full." *Id.*

32. In the Debtor's most recent state court divorce litigation, he sought to have his child support obligation reduced. The Debtor represented to the state court that he has does not have sufficient income to make his monthly child support payments and has been "taking out

---

[7] The child support arrears are the result of lengthy litigation in Columbia County case number 10-FA-160.

6

loans against my separate assets and businesses" to make the payments. *Declaration of Nathaniel Cade, Jr.,* Dkt. No. 20, Ex. 1 (Decision of State Court Judge Todd Hepler) at 3.

33. On February 26, 2020, the state court declined to reduce Mr. Eisenga's support obligation and noted that "Mr. Eisenga's representations to the Court and … potential lenders are inconsistent and lacking in credibility." The Court indicated that "millions of dollars have inexplicably vanished or are not properly accounted for." *Cade Declaration*, Ex. 1 at 5.

34. The state court found the Debtor in contempt for failure to pay child support, but the Debtor commenced this bankruptcy case before the court could order purge conditions to resolve the support arrears. *Cade Declaration*, Ex. 1 at 6.

35. Since filing this case, the Debtor has failed to pay his $15,000 monthly child support obligation. Instead, the Debtor paid $1,500 on March 9, 2020, and $1,250 on April 13, 2020; amounting to ten percent or less of his support obligation.

**ARGUMENT**

**Cause Exists To Dismiss This Case**

36. In relevant part, Section 1112(b) of the Bankruptcy Code provides that on the request of a party in interest, and after notice and a hearing, the court shall convert the case to Chapter 7 or dismiss the case, whichever is in the best interests of creditors of the estate, so long as the movant establishes "cause." *See* 11 U.S.C. § 1112(b)(1).

37. Section 1112(b)(4) sets forth a list of sixteen grounds that constitute "cause" for conversion or dismissal. *See* 11 U.S.C. § 1112(b)(4)(A)-(P). This list is not exhaustive, and a case may be dismissed or converted for causes other than those specifically identified in section 1112(b)(4). *See In re Tekena USA, LLC*, 419 B.R. 341, 346 (Bankr. N.D. Ill. 2009); *In Matter of Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D. Ill. 2007).

7

### a. Cause Exists to Dismiss Because the Debtor's Estate Suffers from a Continuing Loss and Does Not Have a Viable Prospect For Rehabilitation.

38. The Court may dismiss a case for "cause" if the Court finds that there is a "substantial or continuing loss to, or diminution of, the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A); *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009).

39. There are two elements to consider under Section 1112(b)(4)(A): (i) a "substantial or continuing loss to or diminution of the estate," and (ii) the "absence of a reasonable likelihood of rehabilitation." *See* 11 U.S.C. § 1112(b)(4)(A). Both elements are present here.

### (i) Substantial or Continuing Loss to or Diminution of Estate

40. Courts have held that a "[n]egative cash flow and an inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard for purposes of § 1112(b).'" *Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007); *see also In re Schriock Constr.,* 167 B.R. 569, 575 (Bankr. D.N.D. 1994) ("This element can be satisfied by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the entry of the order for relief.")  "Negative cash flow means that the estate's current liabilities are increasing more rapidly than cash is available to pay as due." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

41. In the present case, a continuing loss and diminution of the estate exists because the administrative expenses and domestic support obligation continues to accrue while the Debtor has no ability to pay the estate's liabilities. The Debtor reports negative monthly income

8

of <$13,485> and has accrued additional child support arrears since the bankruptcy was filed. These facts are sufficient to justify a finding of continuing loss to the estate or a diminution of the estate.

### ii. Absence of Reasonable Likelihood of Rehabilitation

42. "Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Canal Place Ltd. P'ship*, 921 F.2d 569, 577 (5th Cir. 1991). Courts have also found that a debtor lacks a reasonable likelihood of rehabilitation where its only source of income is speculative. *See In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 743–44 (Bankr. N.D. Ill. 2004).

43. The Court should dismiss this case because the Debtor has no realistic prospects for reorganization. Reorganization requires that all post-petition domestic support obligations be paid in full in order for the plan to be confirmed. 11 U.S.C. § 1129(a)(14). Reorganization also requires that all pre-petition domestic support arrearages be paid over the term of the plan. 11 U.S.C. § 1129(a)(9)(B). Therefore, any viable plan for reorganization must provide for the payment the Debtor's monthly child support obligation of $15,000, and the Debtor must be current on post-petition support payments at confirmation.

44. The Debtor's child support obligation was heavily litigated, and the state circuit court recently upheld the $15,000 monthly support obligation. *Cade Declaration*, Ex. 1 at 5. The Debtor's support obligation is fixed and must be addressed in any feasible plan for reorganization.

45. The Debtor is already behind on his post-petition child support by at least $27,250, even with only two support payments having become due and owing since he filed his bankruptcy. At this rate, it is unlikely the Debtor can become current on his child support

obligations to allow a plan to be confirmed. Further, the Debtor's $200,000 in child support arrears must be paid over the term of a plan. If the Debtor cannot pay his ongoing monthly support obligation, he is certainly unable to pay towards additional arrearages.

46. The Debtor's Motion for Joint Administration states the Debtor's "plan" is to secure a tenant for the CCC Property after a "reasonable period of time" in order to increase its value to $6.3 million. *Motion for Joint Administration*, Dkt. No. 11, ¶ 8. The plan to secure a tenant is entirely speculative, as the Debtor has not identified any potential tenants and has struggled to find and maintain a tenant since the CCC Property's inception.

47. Even if the Debtor is able to secure a tenant for the CCC Property and increase its value so that it is no longer under secured, the Debtor lacks the income to successfully complete a plan of reorganization. The Debtor asserts the "cash flow from his other businesses" will be "sufficient to pay all creditors in full." *Id.* However, the Debtor already receives cash flow from his other businesses, and this cash flow is insufficient to pay his monthly obligations, let alone additional plan payments. The possibility of the Debtor fully paying creditors from his cash flow is further contradicted by his representations to the state court that he is paying his child support in part by taking out loans. *Cade Declaration*, Ex. 1 at 3. Based on the Debtor's representations, his cash flow is simply inadequate to accomplish reorganization.

48. When asked at the 341 meeting how the Debtor intended to reorganize in light of his domestic support obligation, and subsequent negative monthly disposable income, the Debtor and his counsel were unable to provide any concrete suggestions. While the Debtor owns various parcels of real estate that could be sold in an attempt to reorganize, he is also reliant on that same real estate to generate his income. A sale of real estate would reduce the Debtor's monthly income and would further frustrate the possibility of reorganization.

49. The Debtor's inability to pay his monthly child support obligation and arrearages make reorganization impossible. The estate has no reasonable likelihood of rehabilitation, and thus satisfies the second prong of 11 U.S.C. § 1112(b)(4)(A).

### b. The Debtor's Failure to Pay a Post-petition Domestic Support Obligation Constitutes Cause for Dismissal Under 11 U.S.C. § 1112(b)(4)(P):

50. Dismissal for cause is warranted where the debtor has failed to pay any domestic support obligation that first becomes payable after the date of the filing of the petition. 11 U.S.C. § 1112(b)(4)(P). *See, e.g., In re Rivera Guzman*, 2018 Bankr. LEXIS 1776 (D. Ct. P.R.).

51. The Debtor's child support obligation is a domestic support obligation as defined by 11 U.S.C. § 101(14A).

52. The Debtor has had two child support payments become due and owing since filing the bankruptcy petition. He has failed to make either payment. While the Debtor did make fractional payments of ten percent or less than the amount owed, he has failed to make any full payments. This is consistent with his pre-petition conduct and explains why he has accrued $200,000 in child support arrears.

### c. The Case Should be Dismissed Because the Debtor has Not Filed Bankruptcy in Good Faith:

53. Beyond the Debtor's inability to rehabilitate, dismissal is appropriate because of the Debtor's bad faith. *In re Landmark Atl. Hess Farm, LLC,* 448 B.R. 707, 711 (Bankr. D. Md. 2011) "Courts have found a lack of good faith or unclean hands to constitute sufficient 'cause' to dismiss a bankruptcy case." *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co.,* 476 B.R. 60, 68 (U.S. Dist. 2012), *citing In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393, 1394-95

(11th Cir. 1988); *Pleasant Pointe Apts., Ltd. v. Ky. Hous. Corp.*, 139 B.R. 828 (W.D. Ky. 1992); *In re Julian,* No. 11-30151(LMW), 2012 Bankr. LEXIS 494 (Bankr. D. Conn. Feb. 15, 2012).

54. Courts may consider whether the debtor's pre-petition conduct was deceptive, whether there is no possibility of reorganization, and whether the debtor's income is sufficient to operate. *In re LJBV LTD,* 544 B.R. 401, 404-405 (Bankr. N.D. Ill. 2016). Not all of these circumstances are necessary to find bad faith, rather bad faith is determined by considering the totality of the circumstances. *See, e.g., In re The Ophir Trust*, 112 B.R. 956, 960 (Bankr. E.D. Wis. 1990); *Clear Blue Water,* 476 B.R. at 68; *In re Coffee Cupboard, Inc.,* 119 B.R. 14, 18 (Bank. E.D.N.Y. 1990).

55. To succeed on a motion to dismiss for bad faith, the United States Trustee does not need to make a showing that the Debtor's intent in filing was to further his frauds. *In re Original IFPC Shareholders, Inc.,* 317 B.R. 738, 749 (Bankr. N.D. Ill. 2004) (citing and quoting *In re Leavitt,* 209 B.R. 935, 940-41 (9th Cir. Bap 1997), *aff'd,* 171 F.3d 1219 (9th Cir. 1999) ("malfeasance is not a prerequisite to bad faith.").

56. This case is clouded by the Debtor's pre-petition deception and fraudulent acts. The Debtor forged the Festival Lease and SUPERVALU guaranty to induce Alliant to provide a note and mortgage to CCC. Then the Debtor initiated CCC's bankruptcy filing only hours before Alliant's confirmation hearing to finalize its foreclosure on the CCC real estate. This case further frustrates Alliant's ability to enforce its rights on the Debtor's personal guarantee.

57. The Debtor invoked his Fifth Amendment rights at the § 341 meeting to avoid answering any questions about the Festival Lease or SUPERVALU Guaranty. In civil proceedings, the court is "permitted to draw negative inferences from the assertions of this privilege." *In re*

12

*Veluchamy*, 879 F.3d 808, 825 (7th Cir. 2018). The Debtor's invocation of the Fifth Amendment, and failure to provide any explanation for the apparently fraudulent Festival Lease and SUPERVALU Guaranty, support the contention that the Debtor deceived Alliant to obtain a $7 million loan.

58. The Debtor is also using the bankruptcy system to thwart payment of his child support arrears and monthly support obligation, as the state court's ability to enter a purge order is on hold while the bankruptcy is pending. *Cade Declaration,* Ex. 1 at 5. The Debtor has failed to make any substantial child support payment since the bankruptcy filing and is unable to make these payments with his reported income. The Debtor is well aware that there is no possibility of reorganization because he does not have sufficient income to pay a required domestic support obligation.

59. The filing of this case serves no legitimate purpose other than to frustrate creditors because the Debtor has no possibility of reorganization. The Debtor's stated "plan" for reorganization is unlikely to come to fruition and does not account for his negative monthly cash flow. The debtor filed his bankruptcy case as a means of shielding himself from the financial consequences of his fraudulent actions and to further frustrate Alliant and Ms. Hawthorne's attempts to enforce collection efforts.

60. It is in the best interests of the creditors that this case be dismissed. Dismissal will allow creditors to resume and finish their state law actions and enforce state court orders without the Debtor hiding behind bankruptcy protections.

## CONCLUSION

31. Based on the foregoing, the United States Trustee submits that cause exists under Section 1112(b) to dismiss this case.

WHEREFORE, the United States Trustee respectfully requests this Court to enter an order dismissing this case.

RESPECTFULLY SUBMITTED:

PATRICK S. LAYNG
UNITED STATES TRUSTEE

Dated: April 23, 2020     By:     /s/ *Jennifer K. Niemeier*
Jennifer K. Niemeier, Trial Attorney
Office of the U.S. Trustee
780 Regent Street, Suite 304
Madison, WI  53715
(608) 264-5522

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Michael S. Eisenga, | ) | CASE NO. 20-10423-cjf |
| | ) | |
| DEBTOR. | ) | |

**CERTIFICATE OF MAILING**

The undersigned hereby certifies that on April 23, 2020, copies of the **UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 1112(b)** in the above case were served by electronic mail from the clerk's office on:

Nathaniel Cade     nate@cade-law.com, beth@cade-law.com
Matthew L. Comella     bkpleadingsWEST@wi.cslegal.com, matthew.comella@codilis.com
Jerome R. Kerkman     jkerkman@kerkmandunn.com, lewert@kerkmandunn.com;nkerkman@kerkmandunn.com
Evan P. Schmit     eschmit@kwdlaw.com
Kimberly P. Sebranek     k.sebranek@els-law.com, p.filter@els-law.com
John Van Lieshout     jvanlieshout@reinhartlaw.com, dheracovici@reinhartlaw.com

And by first-class mail on:

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

Synchrony Bank
170 W. Electron Road Suite 125
Draper, UT 84020

 */s/ April Wentz*
April Wentz
Legal Assistant

2